UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )    CRIMINAL NO.  04-10288 RWZ
                         )
         V.              )
                         )
                         )
    JOSE MELO            )

DEFENDANT JOSE MELO'S SENTENCING MEMORANDUM

**HISTORY OF THE CASE:**

On September 22, 2004 the defendant Jose Melo was indicted by the United States for violation of 21 U.S.C. §846, Conspiracy to Possess with Intent to Distribute, and to Distribute, Oxycodone (Count One)[The October 2003 through June 10, 2004 Transactions], 21 U.S.C. §841(a)(1), Distribution of Oxycodone and 18 U.S.C. §2, Aiding and Abetting (Count Sixteen)[The June 7, 2004 Transaction], 21 U.S.C. §841(a)(1), Distribution of Oxycodone, 18 U.S.C. §2, Aiding and Abetting (Count Seventeen)[The June 10, 2004 Transaction].  The indictment further alleges, as surplusage the following:

> The defendant Jose Melo is accountable for a quantity of oxycodone that, when converted to marijuana as provided by USSG §2D1.1 (drug equivalency table), is equivalent to at least 100 kilograms but not more than 400 kilograms of marijuana.  Accordingly, USSG

§2D1.1(c)(7) applies to this defendant.  See indictment, p. 21 ¶2.

On March 17, 2006 the defendant offered a change of plea to all counts in the indictment.

**STATEMENT OF FACTS:**

The facts as herein stated are taken from the Affidavit of Special Agent Steven C. Story in support of complaint number 04-1809 CBS.  In the "Attachment to Criminal Complaint", Special Agent Story lists sixteen (16) incidents of distribution of oxycodone commencing on October 29, 2003 and ending on the date of the arrest of Melo and others, June 10, 2004.  These incidents underlie the conspiracy indictment to which Jose Melo has pleaded guilty.  The facts supporting counts sixteen (16) and seventeen (17) are laid out in paragraphs 105-125 of the affidavit in support of the complaint as follows:

**Undercover Purchase From Baldassano
And Melo on June 7, 2004**

105. On June 7, 2004, arrangements were made for a new undercover DEA agent ("UCA5") to purchase 100 OxyContin tablets from **Baldassano** for $5,200. Baldassano agreed to meet UCA5 at "Steve's Restaurant" in Gloucester.  While UCA5 was enroute, Baldassano made a series of incoming calls to cancel the proposed deal.  Baldassano explained that he was already at "Steve's" and had determined "there were a lot of police detectives" in the area.  Simultaneous with Baldassano's cell phone calls, surveillance agents observed Baldassano waiting alone inside

the restaurant. At this same time, surveillance agents also saw **Joseph Allen** (a man known to the surveillance agents) being dripped off across the street from Steve's Restaurant by an unidentified driver of a dark Dodge Neon. Surveillance agents saw Allen then enter the restaurant, look around without making contact with Baldassano, and then walk back out of Steve's. Allen was then seen standing in front of the restaurant, where he appeared to be watching all the passing traffic ina manner consistent with conducting counter-surveillance of the area. Baldassano then left the restaurant, walked past Allen without making contact, and continued walking toward Washington Street. Surveillance agents then observed Allen placing a call on the pay telephone outside Steve's Restaurant, while looking in Baldassano's direction as Baldassano continued to walk away from the area. Baldassano was simultaneously observed talking on his cellular phone as he continued walking onto Washington Street. Allen completed the pay phone call and walked across the street to the train station, where he remained for several minutes surveying the general area. In my opinion, Allen was engaged in counter-surveillance for Baldassano and had detected the presence of law enforcement in and around Steves Restaurant.

106. Baldassano requested that UCA5 pick him up at a nearby side street. As Baldassano walked along Washington Street, Allen departed the train station and also walked up Washington Street some distance behind Baldassano. Upon turning onto the side street, UCA5 made contact with Baldassano, who entered the rear passenger seat of the UC vehicle. Baldassano quickly commented "that's fucking crazy" and cautioned UCA5 "don't go down in that area," while pointing in the direction of the restaurant. Baldassano told UCA5 that they had to pick up **"Joey Allen"** and then they could "go right out of town to the dude's house" in "Peabody." At this same time, surveillance agents observed Allen walk to the corner of Gloucester Avenue and Washington Street, and then sit on the stone wall while looking in the direction of Baldassano's

residence located at 220 Washington Street. Baldassano remarked, "Joe [Allen] is moving up to Lowell with me because he got kicked out of his house." UCA5 asked Baldassano if "Joey [Allen] was cool," and Baldassano replied, "yeah."

107. During the ensuing consensually-recorded conversation, Baldassano inquired if UCA5 possessed any drugs in the vehicle and UCA5 responded, "no." Baldassano explained that he was "the most paranoid [about law enforcement scrutiny]" and he described himself as "the safest kid in the world [cautious while conducting drug deals]." Baldassano continued to describe his concern about law enforcement around "Steve's Restaurant." Baldassano commented, "they're obviously thinking I'm doing something [drug dealing]" and "they're just trying to get me in the act [of completing a drug transaction]." Baldassano concluded, "I'm not doing it in this town [Baldassano did not want to do the drug deal in Gloucester.] Baldassano told UCA5, "since they raided my house [in Gloucester], I live out of town now so I do all my [drug] business in Lowell." UCA5 told Baldasssano that he could do the deal "right there [in Gloucester]" in the undercover vehicle. Baldassano indicated that he did not have the pills on him and confirmed that they needed to do the deal at the "dude's house . . . right outside." UCA5 asked Baldassano if he called his guy already and Baldassano replied, "Yeah, he's all set, he said just call him when we're five minutes away [from his residence in Peabody]."

108. While traveling through Gloucester, UCA5 told Baldassano that he wanted to be able to conduct a large OxyContin deal "once a week" with Baldassano and that today's transaction [100 OxyContin pills] was "just a little tester [test deal to see how Baldassano does business]," to which Baldassano replied, "Absolutely, I don't blame you." Baldassano indicated that the pills [OxyContin] are ready and available "at any time" UCA5 needed them. Baldassano related that all UCA5 needed to do was to call him right before UCA5 "ran out [of his OxyContin supply]," and

        Baldassano would obtain the Oxycontin "a day ahead of time [one day before UCA5 planned to obtain the next OxyContin shipment from Baldassano]. Baldassano explained that with that prior telephone call, he would have "them" ready and the deal would happen in "three seconds."

109. Baldassano indicated he could offer a better price per pill if UCA5 purchased larger quantities. Baldassano stated he could obtain "whatever [UCA5] needed [referring to quantities of 80mg OxyContin pills]. UCA5 inquired that the price per pill would be for 500 OxyContin tablets and Baldassano responded with a price of $49 per pill. UCA5 counter-offered with a price of $45. Baldassano indicated he could not give such a price reduction because he could just "pump'em out" all in one "hundred packs [100 pill increments at a higher price]." Baldassano then began to discuss the future of OxyContin pills, indicating within the next six months the current "Oxy's [OxyContin]" will be "wiped out." Baldassano stated that the pharmaceutical manufacturing companies are starting to produce "generics [generic oxycodone tablets]." Baldassano confirmed that the tablets he distributed were the "80 OC's . . . the good ones [referring to the 80 mg trademarked OxyContin pills].' Baldassano commented that "Mass Health" had begun to dispense the generic OC's, and that all the people who were obtaining illegal "scripts" from patients are going to Baldassano to get the "real" OxyContin.

110. Baldassano stated, "My guy [his source of supply] gets them in Florida." Baldassano elaborated about his source, who reportedly told Baldassano that he "was set for a while because they've got a shit load of 'em stocked up [Baldassano's source had a large stockpile of trademarked OxyContin pills]." Baldassano explained that his "guy [OxyContin source] doesn't want to sit on them [the OxyContin tablets], he just wants to pump 'em [quickly sell the pills]." Baldassano explained that his source currently had "fifteen to twenty thousand stacked [15,000 to 20,000 OxyContin tablets on hand]. Baldassano

commented, "When everyone completely runs out of them [illegally stockpiled OxyContin tablets], I'll have them for another five or six months because they're going to keep stocking up [continue to acquire a vast supply of OxyContin]." Baldassano claimed that "you can't sniff" the new generic oxycodone tablets "because when you chop them up, they turn to wax."

111. UCA5 requested that Baldassano reduce his price per pill to $48 and Baldassano replied that he wanted "to stay at $49 for a while." UCA5 eventually committed to an order for 500 OxyContin pills for Wednesday and Thursday [on June 9, or June 10]. Baldassano ultimately agreed to UCA5's request for a price of $48 per pill for the 500 pills. UCA5 inquired if Baldassano sold "green" referring to marijuana. Baldassano replied that he used to "push a lot of wed actually, but its too much quantity now that I got busted, I'm trying to keep it to one thing [limit his drug distribution to one product, being OxyContin]."

112. Baldassano apparently decided to leave Gloucester without first picking up Allen as initially planned. Allen placed an incoming call Baldassano's cell phone, and UCA5 overheard Baldassano instruct him that "Matthews **[Jason Matthews]** and Creamy **[Matthew Cream]** are coming to pick you up right now . . . right in front of my house where I told you to be." Baldassano explained to Allen, "I'm in another car . . . you're going to meet me somewhere [in Peabody after the transaction was complete." Baldassano told Allen to call "Creamy's phone" because "they should be there any minute." Surveillance agents subsequently saw a green Jeep Cherokee driven by Matthews, with Cream as a passenger, pick up Allen from where he had remained waiting in front of Baldassano's residence on Washington Street. Surveillance agents then followed Matthews as he traveled out of Gloucester in the same direction as UCA5 and Baldassano.

113. While traveling from Gloucester to Peabody, UCA5 noted that Baldassano possessed a large amount of

money, which UCA5 estimated to be in excess of $6,000 as Baldassano began counting the cash in the rear passenger seat of the UC vehicle.  In general conversation with UCA5, Baldassano indicated that he had just graduated from the University of Massachusetts in Lowell with a "double major" in marketing and business management.  Baldassano joked that these majors have assisted him in "the advertising" and "the marketing" of his product, and controlling his money [which UCA5 understood Baldassano to be referring to his OxyContin distribution activities].  Baldassano boasted to UCA5 that "everything [OxyContin trafficking] that comes through this city [Gloucester] comes through me."

114. Baldassano told UCA5 that they would do the deal "right in front" of his "guy's house."  UCA5 inquired as to how Baldassano would handle payment for the 100 OxyContin pills.  Baldassano responded that he would pay for the pills with money he already owed to his source so that UCA5 would not have to "front" any money in advance.  Baldassano explained that when he initially began distributing OxyContin, he was buying his OxyContin tablets for $51 per pill and then he was selling them "as singles" for $60 each.  Baldassano commented that he intentionally "low-balled" his price so that he was cheaper then anyone else and as a result, he obtained over 300 customers over a short period of time.  Baldassano said that he then raised his price to $80 per pill once he established his regular clientele. Baldassano boasted to UCA5 that he would distribute up to 2,000 pills every couple of weeks in retail sales alone.  Baldassano said that he eventually "had a couple of people working for" him so he would avoid the risk of high volume retail sales.  Baldassano described his drug felony arrest last summer "for one [OxyContin] pill," which caused Baldassano to become more cautious and engage exclusively in wholesale distribution.  Baldassano commented that Cream was currently his "partner" with whom he "splits everything 50-50."  As UCA5 approached a residence at 20 Tracey Street in Peabody, Baldassano told UCA5 that "this dude runs for my

dude" (i.e., the person who was going to supply Baldassano in this deal worked for Baldassano's source, whom I believe to be **Espinola**). Baldassano further explained that "his dude" **(Espinola)** told him that he has been "stockpiling [80mg OxyContin tablets]" and "we're set for a long time no matter what happens [when "generic" oxycodone pills begin influencing the illicit market]." I determined through further investigation that **Jose Melo** resides at 20 Tracey Street.

115. Upon arrival in front of 20 Tracey Street in Peabody, Baldassano got out of the UC vehicle, entered the residence from the driveway, and then returned to the UC vehicle from the right side of the residence. Baldassano got back into the UC vehicle and handed UCA5 a plastic bag containing 100 80mg OxyContin tablets. UCA5 then handed Baldassano $5,200, which Baldassano counted and placed in his pocket. Before departing the UC vehicle, Baldassano confirmed UCA5's order for 500 pills and suggested that Thursday [June 10] would be a better day for him to do the deal. Baldassano provided UCA5 with his cellular telephone number [978-879-8328] and told UCA5 to call his phone so he could store UCA5's cell phone number. UCA5 then observed Baldassano return to the Tracey Street residence and meet a male, who was subsequently identified by surveillance agents as **Jose "Joey" Melo.** UCA5 then drove away from 20 Tracey Street while Baldassano stayed at that location waiting for Matthews to pick him up. Surveillance agents observed Melo and Baldassano standing together in the driveway of 20 Tracey Street at Matthews pulled up to the residence in his Jeep Cherokee. Baldassano was seen getting into Matthew's Jeep, which was still occupied by Cream and Allen as passengers. Surveillance agents then followed the subject Jeep as the four passengers traveled together back to Gloucester.

116. The above meeting was surveilled, recorded, and partially videotaped by DEA. Each of the 100 OxyContin pills purchased on June 7, 2004 were greenish-blue round-shaped tablets bearing an

"80" mark on one side and "OC" on the other side. Based on my training and experience, as well as my examination of the pills, I believe that the tablets are OxyContin trademarked brand pills that contain approximately 80mgs of oxycodone, a Schedule II controlled substance. These pills are being analyzed at the DEA Northeast Regional Laboratory.

### Undercover Purchase From Baldassano And Melo on June 10, 2004

117. At approximately 4:15 p.m. on June 9, 2004, UCA5 called Baldassano's cellular phone (978-879-8328) and left a voice mail message for **Baldassano** to call back. UCA5 then received an incoming call from Baldassano (caller ID reflected 978-879-8328), who inquired whether UCA5 was "all set" (which UCA5 understood to be a reference to the previously negotiated 500-pill deal proposed to occur on June 10). UCA5 explained to Baldassano that he was attempting to collect the remainder of the purchase money and that he was close to having it all ($24,000). Baldassano told UCA5 that he wanted to make sure that all of the money was together so that Baldassano could place the final order with his source of supply. Baldassano commented that he just wanted to make sure the deal was "going to be definite" for the 500 pills. Baldassano advised UCA5 that he would call his source and make sure "he" had them "on hold" for tomorrow.

118. At 11:55 a.m. on June 10, 2004, UCA5 contacted Baldassano on his cellular phone (978-879-8328) and told Baldassano that he "was all set [to complete the 500-pill deal that day]." Baldassano replied that he was going to give his source a call to confirm the deal. Baldassano told UCA5 that he was in Lowell and inquired whether UCA5 wanted to do the deal in Lowell. Baldassano concluded the call by indicating that he was going to call his source to see if "he's up" (which UCA5 understood to mean whether his source of supply currently possessed the requested 500 OxyContin pills). At 12:53 p.m., UCA5 contacted Baldassano (at 978-879-8328), who

said that he had recently talked to his source and stated "he [the source] was all set." UCA5 agreed to meet Baldassano near Exit 5B off of the Lowell Connector and to give him a ride to Danvers to conduct the deal.

119. At approximately 2:30 p.m., UCA5 picked up Baldassano in Lowell and they drove together to Danvers. During a consensually-recorded conversation while UCA5 and Baldassano were riding together, Baldassano said that he personally did not "ride [a motorcycle]," but that "all [his] boys ride bikes [motorcycles]." Baldassano continued that these close associates were all members of motorcycle clubs such as the "Red Devils" and the "Hells Angels." Baldassano said "one of [his] boys" wanted Baldassano "to join the Red Devils," which Baldassano described as a "sister club" of the "Hells Angels." Baldassano remarked that he had "a lot of connections" from his "biker" associates, many of whom Baldassano claimed were "full patch" members of these clubs. Baldassano commented that "once you're in [become a member of a motorcycle gang], you're in for good." Baldassano described the Red Devils as "not as hardcore as the [Hells] Angels, [because] job and family comes before the club." Baldassano continued by contrasting, "with the [Hells] Angels, its club first before anything else." UCA5 inquired if many of Baldassano's associates in the motorcycle gangs dealt with OxyContin, to which Baldassano responded, "they don't tell me their business, I don't ask . . . They're not the type of people to ask what they're dealing, next thing you know you've got four prospects at your door looking for your family."

120. Baldassano suggested that he and UCA5 could return to Tracey Street in Peabody and conduct the 500-pill deal "the same thing [as the transaction on June 7]." Baldassano proposed parking down the street from "his house [20 Tracey Street]" and he would "go in [into the previously identified residence of **Jose Melo**] and grab it and we'll just take off." Baldassano wanted to be dropped off at the North Shore Mall

after the deal. It was eventually agreed that the deal would take place at the 99 Restaurant in Danvers. Baldassano said that the guy would come to the restaurant and that it would be easy for "him" to have "the cash and the shit there." Baldassano then placed an outgoing cell phone call and advised the caller to meet Baldassano and UCA5 inside the 99 Restaurant in Danvers. After Baldassano concluded the call, UCA5 asked Baldassano if his guy "was cool." Baldassano responded: "Obviously, he's my connection. If he wasn't cool, he wouldn't be my connection. I've been going through him [obtaining OxyContin] for five or six years." Baldassano commented that all the parties in the pending deal wanted to be cautious because "it's a lot of cash for him [the source] and it's a lot of cash for you [UCA5]." Baldassano said that he was "stuck in the middle [as the broker of the transaction]." Baldassano advised if the deal was up to him, it would be "boom, boom [completed very quick]."

121. At approximately 3:00 p.m. on June 10, UCA5 and Baldassano arrived at and entered the 99 Restaurant in Danvers. At approximately 3:10 p.m., surveillance **Jose Melo** leave his residence at 20 Tracey Street and get into a red Ford Ranger pick-up truck that was registered to him at that address. Surveillance agents followed Melo from his residence as he traveled directly to the 99 Restaurant in Danvers. Melo then placed a call to Baldassano's cell phone and told Baldassano that he was outside in the lot. UCA5 overheard Baldassano tell Melo to come inside the restaurant and approach Baldassano and UCA5. Baldassano introduced Melo to UCA5 as "Joe" and UCA5 thanked Melo for "coming out [to conduct the drug deal]."

122. UCA5 and Baldassano agreed that the deal would take place in the restaurant parking lot. UCA5 explained that his girlfriend (an undercover Essex County Deputy Sheriff referred to herein as "UCA6") had the $24,000 purchase money with her nearby. UCA5 said that he would have UCA6 bring the money over to the UC vehicle after UCA5 looked at the pills. Baldassano indicated that

he wanted the money and the pills together in the UC vehicle. Baldassano, Melo, and UCA5 then left the restaurant and walked together to Melo's Ford Ranger. Melo got into the driver's side of his vehicle while Baldassano entered the passenger side of the Ford Ranger. UCA5 observed Melo then hand a plastic bag to Baldassano, who got out of Melo's truck. Baldassano then entered the UC vehicle. After Baldassano entered the UC vehicle, Melo yelled over from the truck and asked Baldassano, "Have you talked to Carlos lately?" (An apparent reference to **Carlos Espinola,** whom I determined was possibly in a drug treatment program at that time). Baldassano curtly replied to Melo, "No, I'll talk to you in a minute . . . I'll jump in with you and go for a ride."

123. UCA5 left the passenger-side door of the UC vehicle open and stood in the doorway while Baldassano displayed the bag containing the OxyContin pills to UCA5. UCA5 then contacted UCA6 and instructed her to bring the purchase money to the 99 Restaurant parking lot. A short time later, UCA6 arrived and handed UCA5 a package containing $24,000 in cash. UCA5 returned to the UC vehicle and gave the $24,000 to Baldassano, who then gave UCA5 the bag containing the 500 OxyContin tablets. UCA5 walked back over the UCA6 and gave her the 500 pills, after which UCA6 drove away in her UC vehicle. UCA5 returned to the UC vehicle where he observed Baldassano counting the purchase money. Baldassano finished counting the stack of $14,000 and told UCA5 that he trusted that the remaining $10,000 was "all there" in the other two stacks of cash. UCA5 and Baldassano briefly discussed the scheduling of future OxyContin transactions. Baldassano got out of the UC vehicle and then joined Melo as a passenger in his Ford Ranger. Melo and Baldassano drove out of the restaurant parking lot together and UCA5 departed the area moments later.

124. Melo and Baldassano traveled together to the North Shore Mall, where Melo dropped off Baldassano. Surveillance agents followed Melo

      into Peabody where he stopped briefly at a convenience store before continuing to his nearby residence. Surveillance agents then observed Melo park his vehicle and enter his apartment located at 20 Tracey Street. Surveillance agents continued to observe Baldassano, who was apparently waiting for a ride at the mall. At approximately 4:30 p.m., surveillance agents observed a white Buick pick up Baldassano at the mall. Agents observed that the Buick was driven by an unidentified male and was occupied by **Matt Cream** and **Joe Allen** as passengers. Surveillance agents then followed the Buick as it was driven back to Gloucester.

125. This transaction was surveilled and recorded by DEA. Each of the 500 OxyContin pills purchased on June 10, 2004 were greenish-blue round-shaped tablets bearing an "80" mark on one side and "OC" on the other side. Based on my training and experience, as well as my examination of the pills, I believe that the tablets are OxyContin trademarked brand pills that contain approximately 80mgs of oxycodone, a Schedule II controlled substance. These pills are being analyzed at the DEA Northeast Regional Laboratory.

**OFFENSE LEVEL CALCULATIONS PURSUANT TO THE GUIDELINES:**

In her initial Presentence Report, Senior United States Probation Officer Jennifer D. Sinclair was correct in her calculations of the base offense level. She stated:

> ¶(97) In total, the defendant is accountable for 301,500 grams or 301.5 kilograms of marijuana equivalency. Pursuant to U.S.S.G. §2D1.1(7), since the amount of marijuana for which the defendant is responsible is at least 100 kilograms but less than 400 kilograms, the base offense level is 26.

After receiving information relative to a "proffer session with the government" Sinclair modified her reports as follows:

¶(96a)  During a proffer session with the government, the defendant admitted to conducting a total of five-to-seven transactions with Baldassano, each for at least approximately one hundred 80-milligram OxyContin pills.

¶(96b)  Using the defendant's statement, the Probation Office has conservatively estimated that at least three additional transactions occurred (in addition to the June 7th and June 10th transactions), each for one hundred 80-milligram pills.  Since none of the three transactions involved seized pills, the Probation Office has used the weight of the substance seized during June 7, 2004 transaction, which also involved one hundred 80-milligram Oxycontin pills.  Using this figure, the net weight for the three additional transactions is 152,760 grams or 152.760 kilograms of marijuana equivalency (i.e., see ¶96, Count # 16 – 50,920 grams of marijuana equivalency x 3 transactions).

¶(97)  In total, the defendant is accountable for 454,260 grams or 454.26 kilograms of marijuana equivalency.  Pursuant to U.S.S.G. §2D1.1(c)(6), since the amount of marijuana for which the defendant is responsible is at least 400 kilograms but less than 700 kilograms, the base offense level is 28.

Jose Melo takes exception to the modification.  The indictment charged and the defendant pleaded guilty to having committed offenses involving more than 100 kilograms yet less than 400 kilograms of marijuana equivalency. Furthermore, in an effort to reduce exposure in this case, Jose Melo attempted to engage in a "safety-valve proffer" pursuant to 18 U.S.C. § 3553(f).  That provisions states:

f) Limitation on Applicability of Statutory Minimums in Certain Cases. — Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. § 841, 844, 846) or section 1010 or 1013 of the ControlledSubstances Import and Export Act (21 U.S.C. § 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that —

   (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

   (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

   (3) the offense did not result in death or serious bodily injury to any person;

   (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

   (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

While perhaps inapplicable under the circumstances at this time,[1] it was the spirit of the safety valve provision of this law that the defendant was trying to embrace when reaching out to law enforcement.  Regardless of the lack of success of the meeting, the government seized the opportunity to contact the probation department and to provide certain specific details to probation regarding additional acts to which Melo admitted.  This was improper, calculating and arguably retaliatory for the defendant refusing to provide information as to others involved in this conspiracy.  As such the offense level should be a 23 as first calculated by the United States Probation Department.

**OTHER CONSIDERATIONS:**

What has been proven is that to which Jose Melo has pleaded guilty.  That plea, which preceded the "safety valve" proffer contemplated more than 100 grams and less than 400 grams of a marijuana equivalent.  Under the tenets of United States v. Booker, 543 U.S. 220 (2005) and Blakely v. Washington, 542 U.S. 296 (2004) this Court should sentence within the guidelines.  Given Mr. Melo's attempt to reduce his exposure this Court is urged to sentence Jose

---

[1] Jose Melo initially intended to contest the criminal history category with particular focus on Peabody District Court Docket Number 9886CR1254A-C.

Melo to no more than the low end of the guideline range of fifty-one (51) months.

Jose Melo,
By his attorney,

_____
Stephen Neyman
160 State Street
8th Floor
Boston, MA 02109-2502
617-263-6800
B.B.O. # 551576

```
            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA  )
                          )    CRIMINAL NO.  04-10288 RWZ
                          )
        V.                )
                          )
                          )
    JOSE MELO             )
```

CERTIFICATE OF SERVICE

    I hereby certify that on April 24, 2006 I caused a copy of defendant's sentencing memorandum to be served on Mr. David Tobin, Assistant United States Attorney, John Joseph Moakley United States Courthouse, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02210 by courier.


_____
Stephen Neyman